Lawrence Rolfing on behalf of Kelly Worden. This is an SSI case on appeal. The only issue on appeal is whether there is substantial evidence for the administrative law judges' rejection of the treating physician that Ms. Worden suffered from a medically determinable severe major depressive disorder that rendered her incapable of engaging in work activity. The primary crux of this case is in chart notes when Dr. Garwal and his therapists indicate slight or slight to moderate disability on the same form where they're writing down poor memory, poor interpersonal relations and an inability to work. Does that indication of a slight impairment or slight disability reflect a work capacity which would render the form ambiguous and pollute the entire record that the ALJ can then use that pollution to discard everything that the treating physician said? Or is that that chart note, that indication of disability on a chart note, referencing something else that is clarified by the contemporaneous notes that indicate that the woman has poor memory function, poor interpersonal relations, and an inability to work part-time or occasionally during the record limited to part-time work activity? And I would that when chart notes contain an arguable ambiguity and that those, that that arguable ambiguity is resolved within the face of the document that the doctor completed all in one sitting, that the ALJ may not use an arguable ambiguity to bootstrap rejection of the entire treating physician's opinion, because what Dr. Garwal said in his chart notes, an inability to work, and what he said in his medical source statements, indicating severe medically determinable impairments in the ability to function, are wholly consistent, and the judge did not have a clear and convincing reason for rejecting those opinions, and under the regulation did not have a good reason under 416927d2. Is it a test that the ALJ must find clear and convincing reasons to reject a treating physician's determination, or simply they must articulate a reasonable basis in the evidence? If there is a conflict with an examining source, then the standard drops to specific and legitimate or a reasonable basis, something that a reasonable person would accept as a good reason for rejecting the treating physician's opinion. But when there isn't a contradiction from an examining source, then the record, then it's clear and convincing. I think that counsel below argued that it was a specific and legitimate standard. It doesn't satisfy that standard either, because the ALJ is, again, trying to use chart notes that a doctor keeps for his own purposes, to keep his own memory refreshed as to what's going on with the patient, and pulling out one straw out of the bundle and saying, this straw makes the entire bundle ambiguous. And that isn't the law, that doesn't comply with administrative law generally, and it doesn't comply with Social Security law specifically. In the case of universal camera, the Supreme Court said that the standard is the record as a whole. We're not allowed to pick and choose little bits and pieces here and there to cobble together reasons for an administrative decision. We have to look at everything in context. And everything in context here has the individual chart notes that have the arguable ambiguity. And the treating physician is indicating on those forms that there is no ability to engage in insight and judgment and that the person is not able to engage in work activity, which makes the medical source statements later that indicate specific limitations wholly consistent with everything that the doctor has found. The case that brings that to fore in the Social Security front is Reddick v. Chater. And in Reddick, the Court said we cannot isolate a specific quantum of evidence. We have to look at the record as a whole. And that's wholly consistent with the Supreme Court's articulation in universal camera. Well, he's looking at the record as a whole. I think you're saying he needs to look at Dr. Grinwall as a whole. But he has to make a determination of Dr. Grinwall's ability and talents and opinion. And then he finds that the notes that he actually takes are different from the opinion. That, to me, is—I don't look at notes. Maybe I'm wrong, and maybe there's some testimony in the record. But the notes are important to the doctor's final determination. As I found it, he doesn't take them just for fun. It's for the record to show how he comes out with a case. And when the notes are different and Dr. Liu's opinion is different, why can't he use that as not crediting Dr. Grinwall? When the ALJ looks at chart notes and says that they're inconsistent with the doctor's conclusion that the person has significant impairments in the ability to function, that articulation only counts to satisfy the Cotton-Lester standard when that articulation has a foundation in substantial evidence. And in this case, it doesn't. For instance, the ALJ said that she was able to take care of three children. Well, two of them were teenagers. One of them was nine years old. And the treatment records indicate that she'd lost custody of her children for seven years and only regained custody recently, and was actually — had inverted the parent-child relationship and was relying on her children to teach her how to function, especially with the ALJ. That thing was all in the record? Yes. Before the ALJ? Yes, it was, Your Honor. It's delineated specifically in the reply brief that we filed, because the commissioner relied heavily on that, and I responded to that by pointing out that the chart notes are not — do not support the ALJ's reliance on those chart notes as a basis for rejecting the treating physician's opinion about workplace impairments. Just saying it's so doesn't make it so. And that's the problem with the ALJ's articulation in this case, is that he's saying something that any fact finder could say in any case. The opinions are not consistent with the chart notes. He's like, can you give me an example? Can you show me in the record? Well, again, we go back to the record as a whole standard. This is a dysfunctional woman. She has a history of — a criminal history. She has a history of methamphetamine abuse. She has a history of alcohol abuse. But the question is whether she has a medically determinable severe impairment that would significantly impact her ability to function on a sustained basis. And the commissioner has always defined — well, in the last 16 years defined that as being able to function on a full-time level. And nowhere in the chart notes and nowhere in the medical source statements is there any indication, other than Dr. Liu, who is not an examining physician, so who does not have an independent clinical basis for those opinions, relying exclusively on the chart notes and because of that only relying on a part of the chart notes instead of all of the chart notes that were before the ALJ. That's where we get to the point that this is a case where the ALJ has used boilerplate to reject the treating physician's opinions instead of looking closely at the record as the ALJ is charged to do. The fact that the ALJ gets to resolve ambiguities doesn't mean an ambiguity necessarily exists. And this record is not clean in the sense that the Kelly warden is — comes before the court a wholly — a victim of circumstances. Some of these are problems that she created in her young life. She'd been abusing drugs and alcohol since she was a teenager. If there is a discussion of her daily activity, is it fair for — or can the ALJ — anything is fair. Can the ALJ focus on that and say, this is different from what the doctor says and this is important? Can the ALJ do that? If the daily activities that are reported in the chart notes and in the testimony of the claimant are inconsistent with the doctor's opinion and not reconcilable, then that is a very good reason for rejecting the treating physician's opinions. But in this case, we have a woman who was abused by her boyfriend. She's trying to get out of an abusive relationship. She's leaning on her teenage children to teach her how to function as an adult because she hasn't been parented. Is that in the notes? Is that in his notes? Yes, it is. In the doctor's notes? In the doctor's notes and it's also in the therapist's notes, the marriage and family therapist notes. But I didn't have a feeling that it was in the doctor's notes. That material's in there also? That material's in the marriage and family therapist notes and they're handwritten, which means they're a little bit difficult to decipher, but taking the time — and I went through this again in the brief and in the reply brief, detailing exactly what the clinicians recorded. And last year, this Court decided Taylor v. Commissioner. And in Taylor v. Commissioner, this Court confirmed that Gomez v. Chater, that the opinions of a nurse practitioner or a social worker or a physician's assistant when they're endorsed by the treating physician become opinions of the treating physician. Well, we don't have quite that problem in this case. In this case, we have mental status examinations by therapists, we have treatment notes by therapists, and we have a doctor that is supervising the treatment and managing the pharmacological aspect of this case and then expressing opinions. And when the doctor's expressing those opinions, to pretend that he's not relying on the people that are working under his supervision is not a valid inference that I don't think the Court should allow the agency to draw unless there's evidence of malfeasance. And there's no evidence of malfeasance in this case. Mr. Rothman, what's the significance of the ALJ's findings with regard to her daily activities of doing various types of volunteer work, the finances at home, taking care of a pet, using public transportation, driving a car, going out every day by herself, reading religious materials and other books, traveling to visit family? Mm-hmm. Your Honor, Ms. Worden was going to the church and doing some volunteer work at the church, not to get too theological on the subject, but the church isn't there for the healthy, it's there for the sick. And for a church to give Ms. Worden an opportunity to come in and work. But she also did volunteer work for the animal control folks, as I recall. And we know from the human experience that being around animals and pets is probably one of the most soothing and relaxing kinds of experiences. The best way to get better is to help somebody else. And when you're having trouble dealing with people, which is one of her biggest problems, is dealing with people. And even Dr. Liu acknowledged that in finding moderate deficiencies in social functioning. But her biggest problem is dealing with people for her to find refuge and having something to do to take care of pets makes sense. It's consistent with the observations that her primary problem is social functioning. Sitting down and managing what meager finances a family on AFDC has, it doesn't take that much effort, especially when her primary problem revolves out of social functioning. And the clinicians noted that she would ramble and she would go on and on. But she was able to stay on task. Well, she's kind of rambling and disjointed, but able to stay on task. Well, that kind of person that's rambling and disjointed is going to be able to take care of their finances as well. It's not that far of a stretch. And if you want to find disabled people, don't go to their homes. Because they're not at work. They're not at home. They want to get out of the house. They don't want to go stir crazy sitting around and doing nothing. Because that's just, that's antithetical to the human experience to have to get out and do something other than vegetate in a dark corner of the room. In this case, this Court's jurisprudence on excess pain testimony has long held that there has to be some correlation between the activities and the rejection of the testimony and correlating that to workplace functions. And I have less than a minute, so I'd like to reserve what little time I have. Unless the Court has another question. Okay. Good morning. My name is Shae Bond, and I represent the Commissioner of Social Security in this case. I would just like to begin with, it seems like there's much discussion about the relevance of the daily activities as it relates to Dr. Garewal's opinion. I would like to point out that the allegations that Dr. Garewal is making and suggesting that the claimant is unable to socially function or has a fair to poor ability to relate to others or to basically be mentally functioning, it's contradicted by the nature of the activities that she was engaging in. Going to her church, encouraging teenagers to go to church. She was also assisting with a Girl Scout troop. She said she was assisting with her son's young Marine Corps troop. She was able to go outside. She was able to go to the park. And this all contradicted the allegations that she was really limited in social functioning. I would submit that someone who claims that she can't do these activities or that she can't be around people, she can't be around people that she's actually familiar with, wouldn't even attempt to engage in those types of activities, and yet she was. I would also like to point out that as regards her care for teenagers, there is evidence in the record, and this is the claimant's own statements in her questionnaire to the agency at page 121 of the record. She was asked if she cares for anyone else such as children, and she said yes, and she said her teenagers. But she also said, I cook for them, I shop for them, and with them, I try to get on them to clean the house and themselves, and I take them to church. I think that's indicative of more than just, or at least contradicts, the allegation that the teenagers were actually taking care of her. Now, to the extent teenagers were assisting her with household chores and whatnot, I mean, that's not unusual for a teenager to do that, but she did admit on this record that she was caring for them. And that, again, would contradict any suggestion that she would have anything more than a mild limitation, say, in social functioning in this case. And in fact, Dr. Garowal had stated in his questionnaire, I'm sorry, stated in his opinion, that her social functioning actually was mildly limited. So I think on this record the ALJ correctly concluded that the mental impairment was not severe based on daily activities. And I would also point out that, you know, when we do get to the administrative hearing, the ALJ did present mental limitations and hypothetical question to the vocational expert, and the vocational expert nevertheless identified, I think it was over 2 million jobs, that the claimant could perform with some mental restriction. And that is basically unchallenged. And the standard here in a case like this, where an ALJ finds at least one severe impairment and finds other impairments not severe, the ALJ is required to consider all the limitations from all those impairments throughout the sequential evaluation process, and that's exactly what the ALJ did here. He didn't find the mental impairment severe, considered it at Step 3, discussed it extensively. I disagree with counsel's characterization that the ALJ's decision used boilerplate analysis here. It's a very extensive discussion, a very good recitation of the record. He made findings include conclusions based on the evidence or lack thereof. And then, again, at Step 5, he did present a hypothetical question that reflected mental limitations, and we have evidence that this claimant can perform a significant number of jobs. And if the Court has any questions. Well, what about the evidence that was presented to the appeals counsel and not considered by the ALJ? And isn't the standard, it's not reasonable probability, it's just a reasonable possibility that it would have changed the opinion of the ALJ. That's a very low threshold, isn't it? I'm sorry, did you say a very low threshold? Yes. The question is, would it possibly change the ALJ's decision? In the appeals counsel order denying review of the ALJ's decision, it did say that the appeals counsel did look at the additional evidence and found that it did not impact, it would not have changed the ALJ's decision. And, you know, again, the record before the ALJ, there wasn't really much in terms of mental health treatment records. There really wasn't. When Dr. Garewall had issued his opinion in November of 2006, he said he had only treated the claimant, I believe, from the month before. And then when you look at the therapy records, I believe from Ms. Bradley and Ms. Murray, there's really not much in those records in terms of objectives. Even when those therapists were evaluating her for the mental status evaluation, you know, she did appear depressed, she was anxious, but there was also, you know, positive findings in the sense that she was oriented or had intact insight and judgment. So, I mean, it didn't really paint a picture of someone who was so limited. And, again, going to the evidence that was submitted to the appeals counsel to address your question, Your Honor, those records really didn't change that fact. It was just more of the same. And to that extent, the appeals counsel was perfectly entitled to say that that would not have changed the LJ's decision based on the additional evidence presented. And if there are any other questions, then we would request that the Court affirm the district court's decision. Thank you. Brunell? Thank you, Your Honor. Mental impairments are manifestly different. The Disability Reform Act of 1984 instituted procedural and structural changes in how the agency addresses mental impairments because it's just not quite that simple. We need medical doctors to look at the record and synthesize the record because we get islands of functioning in a sea awash with disability, and that's exactly what we have in this case is we have savant-like qualities here and there. She's functioning well in this aspect, but she's dysfunctional in that aspect. And that is wholly consistent. The ALJ said that if she was as psychotic as she says she is, she wouldn't be able to take care of her children. Well, nobody, including the claimant, ever said she was psychotic, and the word psychotic does not appear in the Commissioner's brief because she's not psychotic. She's depressed. But it did appear in Dr. Gearwold's earlier report. Right. Right? Yes, but these are the kinds of things that, because it's complex, because a good expert witness in the treating physician becomes an expert witness, their opinion is going to flex and change as they get more and more information. And through this three-year process of treating Kelly Warden on an ongoing basis, Dr. Gearwold settled on the proposition that she had a major depressive disorder. Without psychotic episodes or without psychosis. I don't think that that's a diagnosis that carries the day and has longitudinal staying power, but the depressive disorder does. And, in fact, and this is what I wanted you to focus on if you could, the additional evidence submitted to the Appeals Council, that information from Dr. Gearwold, there was no indication of psychosis. Right. Would that information, do I have the standard right? Isn't it just a reasonable possibility rather than a reasonable probability? The regulatory standard is it has to change the weight of the evidence, and the weight of the evidence is up to the ALJ to determine. So I think reading the regulation, the reasonable possibility is the same. Under the Sentence 6 standard and the Wainwright standard, reasonable possibility is the right standard. It's unclear, and some circuits have kind of blurred the line between Sentence 6 remands for new and material evidence and Appeals Council evidence. This circuit has drawn a line between the two properly. So it's just part of the record. And the question under, again, Taylor. I think in this circuit, the reported decisions have talked about reasonable possibility. There are some other decisions, though, that talk about reasonable probability. It's an important distinction, I think. Your Honor, as much as I would like to agree with the Court, my reading of Taylor is a little more narrow than that. I think that, and Taylor really is the ultimate disposition of the line of cases that starts in Ramirez and gets confused in Mays and other cases. But the decision in Taylor, October of last year, says that when there's Appeals Council evidence submitted, the Court's role is to determine whether the ALJ's decision is supported by substantial evidence, based on the record as a whole standard, in light of the fact that we have this new and material evidence. So the Court doesn't review the Appeals Council's denial of review, but looks at the ALJ decision in light of the new and material evidence. Thank you very much. Thank you. Thank you. Thank you both for your presentation. The warden v. Astro will be submitted, and court will be adjourned. Thank you.
judges: Bennett, Wallace, Bea